Jasen, J.
(dissenting). On the conceded facts and circumstances present before the authority, I would hold that its determination that the issuance of the license to petitioner would not be in the public interest and would not promote public convenience and advantage was anything but arbitrary and capricious. There can be little doubt that the disapproval of petitioner’s license application by the authority was an act within the compass of its discretionary power to issue or *39 refuse to issue an entertainment liquor license predicated upon its determination "whether public convenience and advantage will be promoted.” (Alcoholic Beverage Control Law, § 2.) In my opinion, the determination disapproving the license application, upon the record presented, was a reasonable exercise of that discretion.
After initially disapproving the application on November 15, 1978, the authority thereafter granted petitioner’s request to reconsider the disapproval and upon reconsideration made the following determination:
"The applicant will operate the proposed premises as a discotheque with a seating capacity for 250 persons. The applicant’s proposed layout, however, states that the premises can accommodate more than 1400 persons at one time. The applicant’s brochure states that the premises will offer * * * 'Three floors of thrills * * * Disco Dancing to the Most Incredible Sound System in New York. Carousel with original steeplechase horses * * * Carnival Games for the Young at Heart * * * and excitement * * *’ The premises will have three standup bars. The ground floor, which houses the main dance floor, will have a 105 foot serpentine shaped bar. The mezzanine which contains another dance floor has a 32 foot standup bar. The basement has a game room and a 20 foot semicircular bar.
"In the Authority’s experience, discotheques of this size, with their attendant crowds of patrons, often result in a significant increase in noise, vehicular traffic and pedestrian congestion in the surrounding neighborhoods. The Authority is not persuaded that adequate steps have been taken to soundproof the premises so that the highly-amplified disco-beat music cannot be heard outside the premises, particularly during the late night and early morning hours.
“The Authority has approved applications for large discotheques in centers of concentrated night-life entertainment, such as the mid-Manhattan theatre district. In those cases, it was apparent that a benefit to the area would result from an influx of patrons and tourists. However, the Authority notes that the subject premises are located on the corner of 15th Street and Fifth Avenue, in the southern portion of the Chelsea section of Manhattan. The area, although zoned commercially, has a substantial residential population. Within a one block radius there is a school, a church, a townhouse, and apartment houses. Neighborhood redevelopment and loft con *40 versions have encouraged a stable population to move in, creating a larger residential area than zoning maps would otherwise indicate. Many of the long-time residents of the older apartment buildings are elderly.
"The Authority notes that the changeover of the neighborhood to residential use is virtually complete on 15th, 16th and 17th Streets, with two apartment buildings on 14th and 15th Streets.
"The Authority finds that the neighborhood cannot handle the volume of people contemplated by this operation. Notwithstanding the existence of some garages and parking lots in the area, it would not be possible to accommodate all of the vehicular traffic which will be attracted, resulting in double parking and slow-moving traffic, with the attendant noise that congested traffic generates.
"The Authority also notes that the community is and has been struggling to alleviate serious safety problems. The type of operation planned by the applicant would tip the balance against the neighborhood and be disruptive of the style of life there,, incompatible with the right of local residents to the peaceful enjoyment of their community.
"For the foregoing reasons, the Authority finds that the public convenience and advantage would not be promoted by the approval of this application for premises licensed to sell alcoholic beverages for on-premises consumption in this area and that approval of this application would not be conducive to proper regulation and control.
"The Authority also notes the opposition of many community, political and religious leaders in the area. The Authority has received a petition with more than 800 signatures protesting the approval of this application. Letters have been received from State Senator Manfred Ohrenstein (in which he states that he is joined by Assemblyman William F. Passannante), Councilwoman Carol Greitzer and the Pastor of the Church of St. Francis Xavier, all tending to confirm the foregoing.
"The Authority further finds that in connection with the original application, the cost of renovating and equipping the premises was estimated by the applicant at $125,000 and ultimately was raised to $167,000. While the applicant’s request for reconsideration was pending, it came to the Authority’s attention that the applicant had in fact expended a far *41 greater sum in the proposed premises. Thereafter, the Authority conducted a further investigation which disclosed that the applicant had expended $359,580 to renovate, equip and furnish the premises and additionally owed $100,573 on the purchase of fixtures, equipment and furniture. The applicant had not previously informed the Authority of this significant increase in the investment in these premises. The Rules and Regulations of the Authority require an applicant to notify the Authority in writing within 48 hours of any change in fact stated in an application or submitted in support thereof which occur prior to the issuance of the license. The Authority finds that the applicant, while its application was pending before the Authority, concealed and suppressed the fact that its investment in these premises had more than doubled. The Authority further finds that the applicant’s conduct in this matter demonstrates an inability to comply with the Rules and Regulations of the Authority, which conduct was not alleviated by the applicant’s subsequent disclosure, after the fact, upon inquiry by the Authority.
"The Authority has considered this application in the light of all the aforementioned facts and circumstances and the Authority, in the exercise of its considered discretion and independent judgment, determines that approval of this application would pose a threat to the objectives of alcoholic beverage control and to the welfare of this community; that such approval would not be in the public interest and accordingly, the Authority determines that public convenience and advantage would not be promoted by the approval of this application.
"The application is disapproved.”
In reviewing whether the action of the authority was arbitrary and capricious, consideration should be given to the established principle of law governing judicial review, namely that in the absence of clear and convincing proof that an administrative body has acted without reasonable basis, its determinations should be sustained, even though individual Judges might be inclined to feel that they would have reached a different result. (E.g., Matter of Sled Hill Cafe v Hostetter, 22 NY2d 607, 612; Matter of Wager v State Liq. Auth., 4 NY2d 465, 468.) In other words, unless it is clear that there is no substantial reason or basis for the exercise of the discretion vested in the authority, we should not interfere with its determination.
*42 Applying these guidelines to the case before us, I find that the record does support the authority’s determination "that public convenience and advantage would not be promoted by the approval of [petitioner’s] application.” The record discloses that the premises in question can accommodate more than 1,400 patrons at one time, thus making it one of the largest discotheques in New York City. Certainly the authority, based on its expertise, could reasonably conclude discotheques of this size frequently cause problems involving noise, vehicular traffic and pedestrian congestion, all of which work to the detriment of the surrounding community’s well-being — in this case, the South Chelsea residential area. The authority took particular note of the limited number of garages and parking lots in the area which would be available to the crowds frequenting the premises. Consequently, the authority’s conclusion that there would be an attendant and significant increase in traffic noise and double parking is well founded and is not, as the majority categorizes, mere speculation.
The authority has also taken note of the many vigorous community protests and objections voiced by local civic groups, religious organizations, community residents and their elected representatives against the licensing of the premises. While I would agree that such protests, in and of themselves, are not determinative of whether a premises should be licensed or not, such objections should not be disregarded completely in the consideration of whether public convenience and advantage would be served by the granting of an entertainment liquor license. The Legislature in enacting subdivision 7 of section 100 of the Alcoholic Beverage Control Law[1] intended to provide the community in which a new premises for licensing was proposed notice of the pendency of the application and, concomitantly, an opportunity to register protests against the licensing of the premises, such as occurred here. It seems abundantly clear that the Legislature obviously concluded that the voice of the local community was a definite factor to be considered by the authority when *43 determining whether or not public convenience and advantage would be promoted by the licensing of the premises.
Complying with this legislative mandate, the authority received and considered a petition with more than 800 signatures. The petition states that the neighborhood is primarily residential[2] with many elderly residents and that the premises would generate noise, pollution and vehicular and pedestrian congestion. State Senator Ohrenstein, joined by Assemblyman Passannante, both representing the interest of the community, advised the authority that the neighborhood was currently struggling to alleviate serious public safety problems and that "the establishment of a discotheque would serve to seriously undermine these efforts.” Senator Ohrenstein noted the high incidence of violent crimes in the area and the proliferation of drug-related activities which could only be compounded by the introduction of a monstrous discotheque, accompanied by parking and noise problems, loitering, and the like. Further, he advised the authority that neighborhood redevelopment and loft conversions have encouraged a stable population to move into the area, creating a residential community larger than zoning maps indicate, and that attempts were being undertaken to revitalize the merchant strip. Without doubt, the Senator’s expression of concern was justified. Councilwoman Carol Greitzer expressed similar concerns.
In addition, the pastor of the Church of St. Francis Xavier, a church situated around the corner from the discotheque location, submitted a letter in opposition to the establishment of the disco bar stressing that the business operation planned by petitioner would tip the balance against the neighborhood by disrupting the residential style of life. The president of Xavier High School, also located in close proximity to the proposed site, expressed serious concern as to the strain on parking facilities and the increase in traffic problems.
Upon these circumstances, and the reasonable inferences which could be drawn therefrom by the State Liquor Author *44 ity, based on their expertise, I can only conclude that the authority properly exercised its statutory discretion in finding that the operation of such a large scale discotheque would not promote public convenience or the welfare of the residents of the surrounding community. The State Liquor Authority, and not the courts, is in the better position to measure the impact of operating an entertainment complex upon the community, and its determination, if rational, should be upheld. A rational basis for the authority’s decision certainly appears on this record.
Accordingly, I would affirm the unanimous order of the Appellate Division.
Judges Gabrielli, Jones, Wachtler and Fuchsberg concur with Judge Meyer; Judge Jasen dissents and votes to affirm in a separate opinion in which Chief Judge Cooke concurs.
Order reversed, with costs, and judgment of Supreme Court, New York County, reinstated.

. Subdivision 7 of section 100 of the Alcoholic Beverage Control Law provides, in pertinent part: "Within ten days after filing a new application to sell liquor at retail under section sixty-three, sixty-four, sixty-four-a or sixty-four-b of this chapter, a notice thereof, in the form prescribed by the authority, shall be posted by the applicant in a conspicuous place at the entrance to the proposed premises. The applicant shall make reasonable efforts to insure such notice shall remain posted throughout the pendency of the application.”

. The fact that the area was zoned commercial is of little consequence. The commercial zoning classification does not entitle a landowner or lessee to use the property, as a matter of law, for any commercial purpose, especially where, as here, a license is required to operate the premises as an entertainment emporium dispensing liquor. While the zoning classification may be instructive as to the nature of the neighborhood, it is by no means determinative. There can be no doubt that the State Liquor Authority has the absolute right, if not the obligation, to look behind the zoning classification to ascertain the true character of the area.